## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **ESTATE OF CLARA T. TROILO, deceased, by FRANK TROILO, Executor of the Estate of CLARA T. TROILO,** | **Civil Action** |
| *Plaintiff,* | **No. 22-cv-00097** |
| *v.* | |
| **ROSE TREE PLACE, NSL ROSE TREE PLACE, LLC d/b/a ROSE TREE PLACE, WATERMARK RETIREMENT COMMUNITIES, INC., WATERMARK RETIREMENT COMMUNITIES, LLC, WATERMARK OPERATOR, LLC, CYNTHIA EVANS and KAREN MLAWSKY,** | |
| *Defendants.* | |

### MEMORANDUM OPINION

**GOLDBERG, J.**                                                              **February 9, 2023**

Plaintiff, the estate of Clara T. Troilo, originally filed this lawsuit in the Court of Common Pleas of Philadelphia against Defendants Rose Tree Place, an assisted living facility. Ms. Troilo, a former resident of one of Defendants' facilities, died on April 29, 2020 after contracting COVID-19. Plaintiff claims that Defendants caused her death by making misleading and fraudulent statements to family members of residents regarding the number of positive COVID-19 cases within the facility. Plaintiff alleges fraud, negligent misrepresentation, wrongful death, a survival action, violations of consumer protection law, and breach of contract.

Defendants removed this case to federal court, and Plaintiff has filed a motion to remand. For the following reasons, I will grant Plaintiff's motion and remand this matter to the Philadelphia Court of Common Pleas.

1

I.      **Factual and Procedural Background**

The following facts were taken from Plaintiff's Complaint.

Clara Troilo became a resident of Rose Tree Place, an assisted living facility in Media, Pennsylvania, in March of 2019.  (Compl. ¶ 16).  In March of 2020, residents of the facility were placed in isolation because of the COVID-19 pandemic, and families were no longer permitted to visit.  (Id. ¶ 23).  During the ensuing months, Defendants provided the residents' family members with updates via email regarding resident care at the facility.  (Id. ¶ 26).

Plaintiff alleges that Defendants failed to alert residents and their families of positive COVID-19 cases in the facility, and that Defendants' communications "contained material, false, deceptive, fraudulent, and deceitful statements intended to induce residents and their families and loved ones into a false sense of security and to conceal, hide, mask, and cover-up the deadly presence of COVID-19 in the facility."  (Id. ¶¶ 28–29).  Plaintiff claims that during March and April of 2020, Defendants notified residents and families "about service and policy changes and COVID issues," but did not disclose the positive test results at the facility.  (Id. ¶ 30).  As an example, Plaintiff notes that on April 9, 2020, Defendants sent residents' family members an email update stating that no positive COVID-19 test results had been reported at the facility.  (Id. ¶ 31).  Plaintiff contends this statement and others were false, fraudulent, and misleading because Defendants were aware of positive COVID-19 test results among residents as early as February of 2020 but failed to inform residents and families until April 22, 2020.  (Id. ¶ 32).  According to Plaintiff, such statements caused Ms. Troilo's death because the statements "induced [Ms. Troilo] and her family into a false sense of security" and "deprived them of the ability to make proper and informed decisions" regarding her care.  (Id. ¶ 41).

In late April of 2020, Ms. Troilo was transferred by ambulance to Riddle Memorial Hospital and was thereafter diagnosed with COVID-19. (Id. ¶ 37). She died on April 29, 2020. (Id. ¶¶ 37–38).

After Plaintiff filed this action in the Court of Common Pleas, Defendants removed to this court. Currently before me is Plaintiff's motion to remand, which asserts that Defendants have not demonstrated a proper basis for removal. Defendants respond that three grounds for federal jurisdiction exist and thus removal was proper. First, Defendants posit that Plaintiff's claims are completely preempted by the exclusive remedy provided under the Public Readiness and Emergency Preparedness Act, and the claims are therefore subject to federal jurisdiction. Second, Defendants contend that federal officer jurisdiction exists under 28 U.S.C. § 1442 because while treating residents during the pandemic, Defendants acted under specific directives from the federal government. Lastly, Defendants argue that federal question jurisdiction exists pursuant to Grable & Sons Metal Prod., Inc. v. Darue Eng'g & Mfg., 545 U.S. 308 (2005) because the Complaint raises a substantial federal issue.

## II.   **Legal Standard**

Under 28 U.S.C. § 1441(a), a defendant may remove a civil action filed in a state court if the federal court would have had original jurisdiction over the action. 28 U.S.C. § 1441(a). A defendant bears the burden of establishing that removal jurisdiction is proper. Boyer v. Snap-On Tools Corp., 913 F.2d 108, 111 (3d Cir. 1990). Once an action is removed, a plaintiff may challenge removal by moving to remand the case back to state court. 28 U.S.C. § 1447(c). Remand to the state court is appropriate for "(1) lack of district court subject matter jurisdiction or (2) a defect in the removal procedure." PAS v. Travelers Ins. Co., 7 F.3d 349, 352 (3d Cir. 1993). Remand is mandatory and can occur at any time during the litigation if the court determines that it lacks subject matter jurisdiction. 28 U.S.C. § 1447(c). "The defendant's right to remove is to be

3

determined according to the plaintiffs' pleading at the time of the petition for removal, and it is the defendant's burden to show the existence of federal jurisdiction." Abels v. State Farm Fire & Cas. Co., 770 F.2d 26, 29 (3d Cir. 1985).  Because proceeding in a case without valid subject matter jurisdiction would make any decree in the case void, removal statutes are strictly construed, and all doubts are resolved in favor of remand.  Id.

## III.   **Statutory Background**

To better understand Defendants' remand opposition, I begin with a background on the Public Readiness and Emergency Preparedness Act ("PREP Act").

Defendants argue that remand to state court is improper because Plaintiff's claims are exclusively governed by a federal statute – the Public Readiness and Emergency Preparedness Act. This Act authorizes the Secretary of the Department of Health and Human Services ("DHHS") to issue a declaration in response to a public health emergency.  A PREP Act declaration provides immunity from suit and liability for certain "covered persons" during the public health emergency. 42 U.S.C. §§ 247d-6b, 247d-6e.  The Secretary's declaration in the Federal Register will also recommend certain "covered countermeasures" allowed by the Act.  Id. § 247d-6d(b)(1).  Covered persons are immune from suit for claims of loss "caused by, arising out of, relating to, or resulting from" the administration of covered countermeasures.  Id. § 247d-6d(a)(1).  Under the declaration issued during the COVID-19 pandemic, "covered countermeasures" include all drugs, devices, or products "used to treat, diagnose, cure, prevent, or mitigate COVID-19," and their component materials, or devices used to administer such products.  85 Fed. Reg. 15198.  "Covered persons" under the Act include those who manufacture, distribute, prescribe, administer, distribute, or supervise or administer programs related to these covered countermeasures. Id. § 247d-6d(h)(i)(2). An exception to immunity for covered persons exists for a claim of death or serious physical injury

proximately caused by willful misconduct.  Id. § 247d-6d(d)(1).  The Act describes such a claim as "an exclusive Federal cause of action."  Id.

In March of 2020, the Secretary of DHHS issued a PREP Act declaration for the COVID-19 public health emergency.  The "[a]dministration of a covered countermeasure" includes "physical provision of the countermeasures to recipients, or activities and decisions directly relating to . . . delivery, distribution, and dispensing of the countermeasures to recipients" and "management and operation of countermeasure programs."  85 Fed. Reg. 15200.  This Declaration has been amended to clarify that the Secretary intended covered countermeasures to encompass the full range allowed by the Act, including respiratory protective devices and all products that "limit the harm such pandemic or epidemic might cause."  42 U.S.C. §§ 247d-6d(i)(1)(D), 247d-6d(i)(7)(A)(i)(II); 85 Fed. Reg. 35100.  According to DHHS guidance, COVID-19 diagnostic tests approved by the FDA fall within the Act's definition of a "qualified pandemic or epidemic product."  42 U.S.C. § 247d-6d(i)(7); see Advisory Opinion on The Public Readiness and Emergency Preparedness Act and The March 10, 2020 Declaration Under The Act (April 17, 2020, as Modified on May 19, 2020, at 4).

**IV.**   **Analysis**

As discussed above, removal is warranted only if the federal court would have had original jurisdiction over the action, and it is the removing defendant's burden to establish the existence of federal jurisdiction.   Defendants advance three arguments for jurisdiction: (1) complete preemption of Plaintiff's claims under the PREP Act; (2) federal officer removal; and (3) presence of a substantial federal issue under Grable.

1.   Complete Preemption Under The PREP Act

"Federal preemption is a defense to state law claims."  Maglioli v. Alliance HC Holdings, LLC, 16 F.4th 393, 406 (3d Cir. 2021).  Because federal preemption does not appear on the face

of a plaintiff's complaint, it typically does not authorize removal to federal court.  Id.  The doctrine of complete preemption, however, provides that where Congress has "so completely preempt[ed] a particular area [of law]," a "civil complaint raising this select group of claims is necessarily federal in character" and is treated as such even if the complaint only raises state law claims.  Id. at 407 (quoting Metro Life Ins. Co. v. Taylor, 481 U.S. 58, 63–64 (1987)).  "The PREP Act unambiguously creates an *exclusive* federal cause of action" for claims of harm proximately caused by willful misconduct, *id.* at 409, and therefore a showing that a plaintiff's claims fall within that exclusive federal cause of action would justify removal.  See id.  at 410 (emphasis in original).

Defendants argue that Plaintiff's state law claims are completely preempted by the PREP Act because the Complaint alleges willful misconduct related to Defendants' administration of covered countermeasures.  (Def.'s Br. at 12).  Plaintiff does not dispute that Defendants are covered persons under the Act, or that Plaintiff's fraud claims involve allegations of willful misconduct.  (Pl.'s Br. at 9).  However, Plaintiff contends that "none of [their] claims in any way involve a 'covered countermeasure' as required for the PREP Act to apply."  Id.  Rather, Plaintiff argues that their claims involve "statements and misrepresentations made by or on behalf of Defendants," and do not relate to "medical care provided to [Ms. Troilo]," "pandemic products such as masks, testing products, or protective equipment," or "the use of any drugs or medications, or … respiratory protective devices."  Id. at 9, 11.  Plaintiff posits that its claims regarding Defendants' failure to notify Ms. Troilo and her family about COVID-19 cases are evidenced by "email communications and newsletters," which are not "covered countermeasures" under the Act.

Id. at 11.  Plaintiff additionally asserts that its claims involve "Defendants' inaction," which is not covered by the Act.  Id. at 12.

Defendants respond that Plaintiff's Complaint "implicate[s] the administration of COVID tests, which are indisputably countermeasures under the PREP Act[.]" (Def.'s Br. at 14). Defendants point to portions of the Complaint that "allege[] misconduct implicating specific decisions made by the facility as a program planner in administering COVID-19 tests, monitoring results, notifying patients and authorized contacts of COVID-19 test results and potential exposure, as well as making necessary and strategic decisions with respect to infection and control protocols."  Id.  Defendants also reject the argument that Plaintiff's claims involve inaction, and are thus not covered by the Act, describing those claims as "allegations of active willful misconduct," such as affirmative misrepresentations sent in emails.  Id. at 18.

The Third Circuit recently addressed a PREP Act complete preemption argument in a factually similar case.  In Maglioli v. Alliance HC Holdings, LLC, the estates of several nursing home residents who died from COVID-19 brought negligence and wrongful death claims against the nursing homes in state court. 16 F.4th at 400.  Plaintiffs alleged that the nursing homes negligently failed to take the proper measures to protect residents from COVID-19, and as a result, the residents contracted the virus and died.  Id.  Appealing the district court's remand of the cases to state court, the nursing homes argued that federal jurisdiction existed through complete preemption by the PREP Act.  Id.

Regarding complete preemption, the Maglioli court acknowledged that the PREP Act unambiguously creates an exclusive federal cause of action for claims of willful misconduct.  Id. at 409–10.  Therefore, if a complaint contained allegations of willful misconduct that were covered by the PREP Act, the claims would be completely preempted and removal to federal court would

be proper.  Id.  However, the plaintiffs in Maglioli brought claims of negligence, not willful misconduct.  Accordingly, complete preemption did not apply, and removal on that basis was improper.  Id. at 410–11.

The arguments presented before me differ slightly from those posed in Maglioli.  Here, Plaintiffs admit that they have alleged instances of willful misconduct (in addition to their purely state law claims).  But the preemption analysis does not end there.  Preemption only applies if those claims of willful misconduct are also related to the administration of covered countermeasures under the PREP Act.

For the following reasons, I agree with Plaintiff that the loss alleged in the Complaint is not related to the administration or use of covered countermeasures and, therefore, the claims are not covered by the PREP Act.

According to the Secretary's declaration, "[a]dministration of a covered countermeasure" includes "physical provision of the countermeasures to recipients, or activities and decisions directly relating to . . . delivery, distribution, and dispensing of the countermeasures to recipients" and "management and operation of countermeasure programs."  85 Fed. Reg. 15200.  This definition only extends to management and operation "insofar as those activities directly relate to the countermeasure activities."  Id.  Plaintiff does not claim that Ms. Troilo's death resulted from the direct administration of COVID-19 tests.  Rather, the Complaint alleges that Ms. Troilo and her family relied on Defendants' statements in deciding that she would remain at Rose Tree Place, and that her subsequent death resulted from Defendants' misleading statements about the presence of positive COVID-19 cases within the facility.  In short, the alleged conduct at issue here is the

making of false statements and misrepresentations regarding the results of COVID-19 tests, not the actual administration of those tests.[1]

My conclusions are consistent with federal courts in other jurisdictions that have examined this issue.  For example, in <u>Estate of Spring v. Montefiore Home</u>, 2022 WL 1120381, at *5 (N.D. Ohio Apr. 14, 2022), a district court found that "falsifying COVID-19 test results" and "intentionally obscuring the number of active COVID-19 cases at [a] facility to hide a COVID-19 breakout within [that] facility" do not constitute the administration or use of covered countermeasures.   While Plaintiff here does not suggest that Defendants *falsified* test results, sending emails to resident family members intentionally obscuring the number of COVID-19 cases at the facility is similarly unrelated to the physical provision of tests.  Neither scenario involves conduct contemplated by the PREP Act, which covers activities intended to *prevent* or *limit* the harm caused by a pandemic.

Given all of the above, I conclude that Plaintiff's claims of loss do not relate to the administration or use of a covered countermeasure, and removal based on complete preemption under the PREP Act is improper.  <u>Rosen v. Montefiore</u>, 582 F. Supp. 3d 553, 561 (N.D. Ohio 2022) ("[F]alsifying Covid-19 test results is not the 'administration' or 'use' of a covered countermeasure. . . . This is not conduct contemplated within the scope of the Act.").

---

[1]     The reporting of COVID-19 test results could be viewed as fundamental to the administration of COVID-19 testing.  Indeed, one objective of testing is to alert communities to transmission risk.  Likewise, an institution's decision regarding when and how to communicate test results might be considered part of administering its testing program.  But there is a difference between deciding on the manner of reporting results and actively communicating false statements or misrepresentations about those results.  Such conduct is not directly related to testing, as it contravenes testing's very purpose by shrouding the information this countermeasure is designed to reveal.

2.      <u>Federal Officer Removal</u>

Defendants also assert that this case is removable under 28 U.S.C. § 1442(a)(1). (Notice of Removal ¶ 76).  A person acting under an officer or agency of the United States may remove a state court action commenced against them to federal court. 28 U.S.C. § 1442(a)(1).  A defendant must satisfy four requirements to remove under this provision:

> (1) [T]he defendant must be a "person" within the meaning of the statute; (2) the plaintiff's claims must be based upon the defendant "acting under" the United States, its agencies, or its officers; (3) the plaintiff's claims against the defendant must be "for or relating to" an act under color of federal office; and (4) the defendant must raise a colorable defense to the plaintiff's claims.

<u>Maglioli</u>, 16 F.4th at 404.

Defendants explain that during the pandemic, "federal authorities have been explicitly guiding" nursing homes' "operational decisions."   (Def.'s Br. at 25). Defendants cite the government's designation of healthcare providers as part of the nation's "critical infrastructure," and assert that the government "enlisted them to carry out the duty of the government itself to ensure the continued provision of 'services critical to the national defense, continuity of government, economic prosperity, and quality of life in the United States.'" <u>Id.</u> at 24.[2] Defendants further contend that the "detailed clinical directives and instructions" issued by the CDC and other federal authorities "represented a marked departure from the regulatory structure which existed before the pandemic." <u>Id.</u> at 26.

---

[2] Defendants cite to the following provisions of The Disaster Relief Act of 1974:

> 42 U.S.C. § 5195c(e) defines "critical infrastructure" as "systems or assets, whether physical or virtual, so vital to the United States that the incapacity or destruction of such systems and assets would have a debilitating impact on security, national economic security, national public health or safety, or any combination of those matters."

> 42 U.S.C. § 5195c(b)(3) describes Congress's finding that "[a] continuous national effort is required to ensure the reliable provision of cyber and physical infrastructure services critical to the maintaining the national defense, continuity of government, economic prosperity, and quality of life in the United States."

The <u>Magliolo</u> court also considered the issue of federal officer removal. The court explained that classic examples of parties who "act under" federal officers are government contractors and nonprofit community defenders who represent indigent defendants. 16 F.4th at 405. The defendants in <u>Magliolo</u> argued that they were acting under the federal government during the pandemic, as they were heavily regulated at the time by entities such as the Centers for Medicare & Medicaid Services ("CMS") and the Centers for Disease Control and Prevention ("CDC"), both of which published comprehensive directives to nursing homes detailing how to limit the spread of the virus. <u>Id.</u>

The court concluded that "the nursing homes were not 'acting under' the United States, its agencies, or its officers" as required by section 1442(a)(1). <u>Id.</u> at 404. The court explained that an entity "subject to detailed regulation and whose 'activities are highly supervised and monitored' is not 'acting under' a federal officer." <u>Id.</u> (quoting <u>Watson v. Phillip Morris Cos.</u>, 551 U.S. 142, 147 (2007)). Instead, an entity must show "something beyond regulation or compliance"—"that their actions 'involve an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior.'" <u>Id.</u> at 404–05 (quoting <u>Watson</u>, 551 U.S. at 152) (emphasis in original). The court highlighted the examples noted above, explaining that government contractors are considered to be acting under the federal government because they "help the Government to produce an item that it needs," <u>Id.</u> at 405 (quoting <u>Watson</u>, 551 U.S. at 153), as well as nonprofit community defenders because they are "delegated authority to [represent indigent defendants] under the Criminal Justice Act and 18 U.S.C. § 3599," and "provide[] a service the federal government would itself otherwise have to provide." <u>Id.</u>

Unlike government contractors, the nursing home defendants in <u>Magliolo</u> did "not assist or help carry out the duties of a federal superior"; and unlike nonprofit community defenders, they

11

were "not delegated federal authority, nor [did] they provide a service that the federal government would otherwise provide."  Id.  And while the nursing homes pressed that they were heavily regulated by federal entities, the court found this regulation alone to be insufficient, characterizing the agency publications the nursing homes were acting under as simply "guidance."  Id.  The court also noted their designation as "essential critical infrastructure" for the federal government was similarly insufficient, noting this was a designation the nursing homes shared with "doctors, weather forecasters, clergy, farmers, bus drivers, plumbers, dry cleaners, and many other workers." Id. at 406 ("Congress did not deputize all of these private-sector workers as federal officers.").

District courts in this circuit have held, consistent with Maglioli, that nursing home defendants who followed guidance from the federal government during the pandemic were not "acting under" officers of the United States for purposes of federal officer removal.  See e.g., Guyer Estate of Markle v. Milton Nursing and Rehab. Ctr., No. 20-cv-2381, 2021 WL 5112269, at *1 (M.D. Pa. Nov. 3, 2021) (rejecting federal officer jurisdiction because "under Maglioli, government guidance won't do[.]"); Morra v. 700 Marvel Road Operations, LLC, No. 22-cv-627, 2022 WL 2915639, at *4 (D. Del. July 25, 2022) ("Defendants were not 'acting under' a federal officer, they have not demonstrated something beyond regulation or compliance, they are not government contractors, and they are not providing a service that the federal government would otherwise provide.").  I find Defendants' argument for federal officer removal unpersuasive for the same reasons it has been repeatedly rejected by other courts in this circuit following Maglioli.

Lastly, Defendants cite Fields v. Brown, 519 F. Supp. 3d 388, 393 (E.D. Tex. 2021), in which a district court in the Eastern District of Texas held that a Tyson Foods meatpacking facility was "acting under" federal authority in ensuring there was an adequate food supply during the pandemic.  The court in Fields concluded that Tyson Foods satisfied the "acting under"

requirement because it was designated as "critical infrastructure" by the federal government and interacted with multiple government agencies, and because additional government funding was allocated for monitoring its facilities.  Id. at 392–93.  Tyson Foods itself had also worked and communicated directly with the U.S. Food and Safety Inspection Service, which had employees staffed onsite at the facility, and worked with the Department of Agriculture and the Federal Emergency Management Agency ("FEMA") to receive personal protective equipment for its employees.  Id.

Here, unlike Tyson Foods in Fields, Defendants do not allege that they themselves communicated or worked directly with federal agencies.  The facility was subject to the same pervasive regulations as other nursing facilities, and nursing facilities were not enlisted to provide services that the government otherwise would.  The federal government simply recognized in its regulatory directives the importance of providing quality healthcare during a pandemic. Accordingly, Defendants did not "act under" an officer or agency of the United States for purposes of federal officer removal, and removal on this basis is improper.

3.    Federal Question Jurisdiction Under The Grable Doctrine

Defendants lastly argue that federal question jurisdiction exists in this case under Grable & Sons Metal Prod., Inc. v. Darue Eng'g & Mfg., 545 U.S. 308 (2005).  Grable recognized that certain state law claims may be considered "arising under the Constitution, laws, or treaties of the United States," 28 U.S.C. § 1331, where those claims "implicate significant federal issues." Id. at 308.  Under the Grable doctrine, federal question jurisdiction exists for state law claims in which a federal issue is "(1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." Gunn v. Minton, 568 U.S. 251, 258 (2013) (citing Grable, 545 U.S. at 313–14).  The "classic example" of a claim necessarily raising a federal issue is one which requires "a determination of

federal law as an essential element of the plaintiff's state law claim." <u>Manning</u>, 772 F.3d at 163 (citing <u>Smith v. Kansas City Title & Trust Co.</u>, 255 U.S. 180, 199–200 (1921) (federal jurisdiction existed where plaintiff sued under a state law which forbade the investment in illegal securities and the basis for illegality was that the securities were issued unconstitutionally)).

Defendants argue that "the PREP Act expresses a clear intention to supersede and preempt state control of the very issues raised by plaintiff, *i.e.,* issues concerning the defendants' decisions as to the use or administration of covered countermeasures." (Def. Br. at 19). In support, Defendants cite a 2021 Advisory Opinion issued by the General Counsel of DHHS in which he discusses "the growing number of suits related to the use or non-use of covered countermeasures against COVID-19." <u>See</u> Advisory Opinion 21-01 On The Public Readiness and Emergency Preparedness Act Scope of Preemption Provision (Jan. 8, 2021). The Advisory Opinion states that: "ordaining the metes and bounds of PREP Act protection in the context of a national health emergency necessarily means that the case belongs in federal court." <u>Id.</u> at 5. Plaintiff responds that its claims satisfy none of the requirements for federal question jurisdiction under <u>Grable</u>.

The <u>Maglioli</u> court also considered whether federal jurisdiction existed under the <u>Grable</u> doctrine in this context. The court concluded that the defendants failed <u>Grable's</u> first step because the plaintiff's claims did not "necessarily raise" a federal issue. 16 F.4th at 413. The defendants argued that PREP Act immunity was a significant federal issue, but the court explained that "a PREP Act preemption defense is not 'necessarily raised' by a well-pleaded state-law negligence complaint." <u>Id.</u> at 413. Preemption would at best be a defense to the state law claims, and the "estates would properly plead their state-law negligence claims without mentioning the PREP Act, so the PREP Act is not 'an essential element of the plaintiffs' state law claim.'" <u>Id.</u> (quoting <u>Manning v. Merrill Lynch Pierce Fenner & Smith, Inc.</u>, 772 F.3d 158, 163 (3d Cir. 2014)).

Plaintiff's claims do not satisfy the first part of the <u>Grable</u> test because they do not "necessarily raise" a federal issue.  There is no indication here that any essential element of Plaintiff's claims requires a determination of federal law.  Defendants assert generally that Plaintiff's claims "implicate[] disputed and substantial federal issues given the PREP Act." (Def.'s Br. at 20).  But Plaintiff's Complaint consists entirely of state law claims.  The only federal issue here is whether federal jurisdiction exists to allow for removal.  The PREP Act is implicated only through Defendants' assertion of complete preemption, which is a jurisdictional doctrine[3] and does not form part of an essential element of Plaintiff's state law claims.

Defendants contend that <u>Maglioli</u> is distinguishable because the plaintiffs there only alleged negligence, and thus the PREP Act applied only as a defense to their state law claims, whereas Plaintiff here brings willful misconduct claims, which are the type completely preempted by the PREP Act.  (Def.'s Br. at 21).  First, I have already found that Plaintiff's claims are not completely preempted by the PREP Act because their alleged loss is not related to the administration of covered countermeasures.  But even if the claims were completely preempted, as explained above, the doctrine of complete preemption is a jurisdictional issue only relevant for determining whether removal is warranted.  As such, it has no bearing on the actual substance of Plaintiff's claims and removal under <u>Grable</u> is improper.

---

[3]    <u>In re U.S. Healthcare, Inc.</u>, 193 F.3d 151, 160 (3d Cir. 1999) ("Unlike ordinary preemption, which would only arise as a federal defense to a state-law claim, complete preemption operates to confer original federal subject matter jurisdiction notwithstanding the absence of a federal cause of action on the face of the complaint."); <u>Metropolitan Edison Co. v. Pa. Pub. Util. Com'n</u>, 767 F.3d 335, 363 (3d Cir. 2014) ("Complete pre-emption, in other words, arises in the context of removal jurisdiction. It serves as a basis for federal jurisdiction over causes of action that may appear, on their face, to be based on state law but that are in truth only actionable under federal law due to Congress's clear intent 'to completely pre-empt a particular area of law.')

V.      **<u>CONCLUSION</u>**

For the reasons given, I will grant Plaintiff's Motion to Remand.  An appropriate order follows.